FILED IN OPEN COURT
U.S.D.C. - Atlanta

SEP 23 2021

KEVIN P. WEIMER, Clerk
By: Deputy Clerk

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal Information |
| *v.* | No. 1:21-CR-356 |
| GLENN PAIR | |

THE UNITED STATES ATTORNEY CHARGES THAT:

**Count One – 18 U.S.C. § 371**
(Conspiracy to Commit Health Care Fraud)

1. Beginning no later than in or about August 2017, and continuing at least until in or about December 2018, the exact dates unknown, in the Northern District of Georgia and elsewhere, the defendant, **GLENN PAIR**, Markuetric Stringfellow, Individual-1, Individual-2, Physician-1, Laboratory-1, and others known and unknown, did knowingly and willfully combine, conspire, confederate, agree, and have a tacit understanding with each other to knowingly and willfully execute and attempt to execute a scheme and artifice to defraud Medicaid, which is a health care benefit program as defined in Title 18, United States Code, Section 24(b), and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, and by the omission of material facts, money and property owned by and under the custody and control of Medicaid, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

**Background**

At all times relevant to this Information:

2. Defendant **GLENN PAIR** and certain co-conspirators operated a program known as "Do It for the Hood" ("D4H") in the Northern District of Georgia and elsewhere. From approximately January 2017 until December 2018, **PAIR** resided in Atlanta, Georgia.

3. **PAIR**, Individual-1, and others pitched D4H to Atlanta-area schools as a "drug-free mentoring program" for high school and middle school students. Part of D4H's program involved holding in-school rallies—known as "Cafeteria Take-Overs"—during which **PAIR** and others, including local rappers, gave speeches and presentations to students enrolled in the program. Students who wished to participate in the D4H program had to submit enrollment paperwork, which included their name, date of birth, and other individually identifying information. Students provided "consent" to undergo drug testing regardless of whether the student had any issues involving drugs or substance abuse.

4. Individual-1 owned and operated National Lighthouse Foundation ("NLF"), a Georgia-based non-profit through which the D4H program was pitched to high schools. Individual-1 also sometimes participated in the D4H in-school rallies.

5. BPolloni Consulting LLC ("BPolloni Consulting") was a North Carolina limited liability company that purportedly provided marketing and consulting services.

6. Individual-2 was the registered agent and Chief Executive Officer of BPolloni Consulting LLC.

7. Laboratory-1 was a registered Georgia limited liability company based in Atlanta, Georgia. It provided independent laboratory testing, including toxicology and drug testing, to the public.

8. Physician-1 was licensed to practice medicine in the State of Georgia. Physician-1 resides in the Northern District of Georgia and treats patients in urgent care and assisted living facilities.

**The Georgia Medicaid Program**

9. Medicaid is a health insurance program that provides for the provision of medical care to eligible low-income families. Medicaid was established to provide an array of health care services and benefits to those who, due to economic circumstances, could not otherwise afford such health care services and benefits. Medicaid is jointly funded by State governments and the United States Department of Health and Human Services, acting through the Centers for Medicare and Medicaid Services. Medicaid is a public plan or contract, affecting interstate commerce, under which medical benefits, items, and services are provided to individuals. Medicaid is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

10. In the State of Georgia, the Georgia Department of Community Health ("DCH") administers Medicaid. Individuals who receive benefits under Medicaid are referred to as "members" or "beneficiaries."

11. In Georgia, the delivery of Medicaid health benefits to some beneficiaries is arranged through a program called Georgia Families, which is a partnership between DCH and multiple private care management organizations ("CMOs"), including CareSource, Peach State Health Plan, Amerigroup, and

WellCare. Funds used to pay for services rendered by the CMOs comes, at least in part, from federal funds provided by through the State's program.

12. Georgia Medicaid also provides for the coverage of services on what is known as a fee for service ("FFS") basis. Under this portion of the program, enrolled Medicaid providers bill the program directly for covered services provided to eligible beneficiaries and receive reimbursement for such covered services through DCH's fiscal intermediary. To be eligible for reimbursement, such services must be medically necessary and comply with Medicaid's policies and procedures, as explained below.

13. DCH sets forth the terms that govern participation in and reimbursement from the Georgia Medicaid program. DCH does this by promulgating its Policies and Procedures for Medicaid/Peachcare for Kids Provider Manuals, which are published on a quarterly basis and made available to providers through its Medicaid Management Information System.

14. In order to submit bills to Medicaid for reimbursement for health care services provided to Medicaid members, an individual or entity must be an approved Medicaid provider. A provider obtains this approval by applying to Medicaid and enrolling in certain Medicaid programs or services. If the application meets certain minimum qualifications, Medicaid will approve the application, and the provider receives a unique identification number called a "provider number." In addition, providers must also obtain a federal identification number, known as a National Provider Identifier or "NPI."

15. After receiving a provider number, the provider may then submit bills, known as "claims," to Medicaid to obtain reimbursement for services provided to Medicaid members. When a claim for reimbursement was submitted to

Medicaid, the provider certified that the contents of the claim were true, correct, and complete, and that the claim was submitted in compliance with the laws and regulations governing the Medicaid program, including that the claim is for medically necessary services that were actually performed.

16. Georgia Medicaid defines the term "medically necessary" to include the requirement that the service is provided within generally accepted medical practices and is appropriate and consistent with the diagnosis of the treating physician and the omission of which could adversely affect the eligible member's medical condition.

17. Georgia Medicaid prohibits offering to pay or payment of remuneration, whether direct, indirect, overt, covert, in cash or in kind, in return for the referral of a Medicaid or PeachCare for Kids member.

18. Because Georgia Medicaid is a "Federal health care program," as defined by statute, federal law makes it illegal to knowingly pay or receive remuneration, including a kickback, bribe, or rebate, to refer an individual to a person (or business) for the furnishing or arranging for the furnishing of any item or service, including laboratory services, for which payment may be made in whole or in part under a Federal health care program.

19. Laboratory service providers must also comply with various rules and regulations promulgated by DCH, including the requirement that laboratories bill Georgia Medicaid only for services requested by an attending or consulting physician, or another medical practitioner operating in a similar capacity and who is separately enrolled in the program.

## Manner and Means

20. Beginning on a date unknown, but no later than in or about July 2017 and continuing until at least in or about December 2018, **GLENN PAIR** and his co-conspirators devised a scheme to defraud Georgia Medicaid by sending urine samples obtained from students participating in D4H's mentoring program to Laboratory-1 for drug testing in exchange for kickbacks paid from claims submitted to Georgia Medicaid, knowing that these were medically unnecessary drug tests.

21. **PAIR** and his co-conspirators enrolled schools into D4H's program through NLF. Frequently, Individual-1 introduced D4H into the schools through NLF. Individual-1 received several thousands of dollars to facilitate the introductions and insisted upon continued payments so long as the kickback agreement existed between D4H, BPolloni Consulting, and Laboratory-1.

22. **PAIR** and his co-conspirators, including Individual-2, by and through BPolloni Consulting, paid local college students to staff DH4's programs. Individual-2 and the college kids were responsible for signing up students at schools—focusing in particular on those who were Medicaid eligible—and going to the students' homes to ensure the students and their parents completed the necessary paperwork. The students also routinely assisted Individual-2 by collecting the urine samples from the students at the schools, as well as at their homes on occasion.

23. **PAIR** and his co-conspirators recruited Physician-1 to be affiliated with D4H as its "Medical Director" and paid Physician-1 a monthly retainer of $3,000

to serve in that role. The purpose of recruiting and paying Physician-1 was for Physician-1 to provide a "standing order" under which Laboratory-1 could submit urine samples for drug testing to Georgia Medicaid and list Physician-1 as the "ordering" physician. The "standing order" was maintained on file by Laboratory-1 which purported to certify the medical necessity of every urine specimen received through D4H for drug testing.

24. Physician-1 did not have a physician—patient relationship with the students and was not their attending, treating, or consulting physician as required by Georgia Medicaid Policies & Procedures. Physician-1 never examined any of the students participating in D4H's programs. Nor did Physician-1 ever conclude that drug testing was medically necessary for any of these students. Physician-1 never reviewed the results of any drug screens performed and never discussed the findings of any drug screens with the individual students.

25. **PAIR** and his co-conspirators entered into an arrangement with Laboratory-1 to perform the drug testing on urine specimens submitted in the names of students participating in D4H's programs. Specifically, **PAIR** and certain co-conspirators, including Individual-2, entered into a purported "marketing agreement" between Laboratory-1 and BPolloni Consulting to facilitate kickback payments from Drug Company-1 to **PAIR** and his co-conspirators for the drug testing referrals for all of the samples obtained through the D4H program. BPolloni Consulting did not provide any marketing or consulting services for Laboratory-1.

26. **PAIR** and his co-conspirators negotiated with Laboratory-1 how they would be compensated for providing the urine samples for the medically unnecessary testing. All payments were routed through BPolloni Consulting under the guise that it was for services performed under the terms of the "marketing agreement." In reality, the payments represented a percentage of the reimbursements received from Georgia Medicaid for the samples obtained through the D4H program.

27. **PAIR** and his co-conspirators would submit and cause others to submit the urine specimens to Laboratory-1 for medically unnecessary drug testing. Laboratory-1 in turn submitted claims to Georgia Medicaid for the medically unnecessary drug testing. Laboratory-1 knew that the samples received from **PAIR** and his co-conspirators came from the various Atlanta-area schools and also knew that the "orders" related to Physician-1.

28. In order to further conceal the illegal nature of their arrangement, Laboratory-1 issued 1099s for tax years 2017 and 2018 to BPolloni Consulting showing that Laboratory-1 paid BPolloni Consulting more than $250,000.

29. As a result of the above-described conspiracy and scheme to defraud, **PAIR**, Laboratory-1, and other co-conspirators defrauded and attempted to defraud Georgia Medicaid of more than $1 million and actually caused Georgia Medicaid to pay out at least $400,000 in fraudulently submitted drug testing claims.

**Overt Acts**

30. In order to carry out the conspiracy and to accomplish the objects thereof, **GLENN PAIR** and known and unknown members of the conspiracy committed various overt acts in the Northern District of Georgia, including, but not limited to, the following:

a. In or about summer 2017, **PAIR**, Stringfellow, and others met with Physician-1 on multiple occasions, including at a restaurant in Marietta, Georgia to explain the D4H program and recruit Physician-1 to serve as its "medical director."

b. On or about August 15, 2017, NLF and Physician-1 entered into a memorandum of understanding under which Physician-1 was purportedly responsible for, among other things, working with at-risk youth, providing clinical oversight, and signing-off on standing orders. Under this memorandum of understanding, Physician-1 received $3,000 per month. **PAIR** was identified as a representative of NLF in the memorandum of understanding.

c. On or about August 15, 2017, Physician-1 completed Laboratory-1's "New Account & Preferred Order Forms." The form included a "standing order" in which Physician-1 falsely represented that urine drug screening was medically necessary for his patients. The "standing order," however, is undated, and did not relieve Physician-1 of his duty to actually order all tests.

d. On or about December 1, 2017, Laboratory-1 and BPolloni Consulting entered into a purported "marketing and sales agreement" in an effort to disguise the basis of the illegal kickback payments between the parties.

e. On or about December 6, 2017, Individual-2 executed a direct deposit authorization form with Laboratory-1 on behalf of BPolloni Consulting, which directed to what bank account the kickback payments should be made.

f. On or about August 1, 2018, Laboratory-1 and BPolloni Consulting entered into a second purported "marketing and sales agreement." Individual-2 executed the agreement on behalf of BPolloni Consulting.

g. On or about October 19, 2018, the COO of Laboratory-1 emailed **PAIR** and Individual-2 regarding a complaint from a student's parent about an unauthorized drug test.

h. On or about November 28, 2018, the COO of Laboratory-1 emailed **PAIR** and Individual-2 regarding an audit by Medicaid CMO WellCare ("WellCare audit") relating to drug testing claims submitted on behalf of more than 150 patients.

i. On or about November 28, 2018, the CEO and President of Laboratory-1 emailed **PAIR** and Individual-2 regarding the WellCare audit.

j. On or about December 12, 2018, in connection with WellCare audit, Laboratory-1 faxed to Physician-1 a cover letter dated November 28,

2018 and a list of individuals for whom Physician-1 purportedly ordered drug testing.

k. In or about December 2018, Physician-1 signed a letter addressed to WellCare that was drafted by Laboratory-1 and printed on Laboratory-1's letterhead falsely representing the medical necessity of the drug testing of the "patients," who were actually students participating in the D4H program. A senior-level employee of Laboratory-1 personally handed Physician-1 the letter to sign.

l. Physician-1 signed the letter falsely claiming that all the individuals identified by the WellCare audit list were Physician-1's patients and for whom medical records existed, when in fact none did so.

m. Between in or about September 2017 and in or about November 2018, Physician-1 received at least $30,000 from **PAIR** and his co-conspirators without performing any legitimate medical services.

All in violation of Title 18, United States Code, Section 371.

**Forfeiture**

31. Upon conviction of the offense alleged in Count One of this Information, the defendant, **GLENN PAIR**, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any and all property, real or personal, constituting and derived, directly or indirectly, from proceeds traceable to the offense, including but not limited to the following:

  a. MONEY JUDGMENT: A sum of money in United States currency equal to the amount of proceeds the defendant obtained as a result of the offense for which the defendant is convicted.

32. If, as a result of any act or omission of the defendant, any property subject to forfeiture:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty;

the United States intends, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property.

KURT R. ERSKINE
*Acting United States Attorney*

ALEX R. SISTLA
*Assistant United States Attorney*
Georgia Bar No. 845602

600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303
404-581-6000; Fax: 404-581-6181